COURT OF APPEALS
DECISION
DATED AND FILED

February 4, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2023AP1981**

STATE OF WISCONSIN

Cir. Ct. No. 2023CV28

IN COURT OF APPEALS
DISTRICT III

PAUL V. FARMER, INC. AND WESTERN NATIONAL
MUTUAL INSURANCE COMPANY,

   PLAINTIFFS-APPELLANTS,

V.

LABOR AND INDUSTRY REVIEW COMMISSION AND JAMES C. RIEDER,

   DEFENDANTS-RESPONDENTS.

        APPEAL from an order of the circuit court for Eau Claire County: EMILY M. LONG, Judge. *Affirmed.*

        Before Stark, P.J., Hruz and Gill, JJ.

        **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Paul V. Farmer, Inc., and Western National Mutual Insurance Company[1] (collectively, Farmer) appeal from the circuit court's order affirming the decision of the Wisconsin Labor and Industry Review Commission (LIRC), which granted James C. Rieder, Farmer's former employee, worker's compensation benefits. LIRC found that Rieder is totally and permanently disabled as a result of a work injury to his back. Farmer raises two issues on appeal: (1) LIRC erroneously concluded as a matter of law that Rieder was totally and permanently disabled; and (2) LIRC acted without authority or in excess of its powers by awarding Rieder worker's compensation benefits because its finding of permanent and total disability is not supported by substantial and credible evidence. For the reasons that follow, we reject Farmer's arguments and affirm.

## BACKGROUND

¶2 Rieder worked as a crane operator for Farmer for approximately twenty-seven years prior to being injured in June 2019. His role with Farmer required him to use a crane to move and place large structures, such as modular homes, grain silos, air conditioning units, and tanks. Rieder was also tasked with placing a crane in the proper location at a job site as well as breaking it down when the job was complete.

¶3 On June 18, 2019, Rieder had finished a job, and he was breaking down a crane and loading the last "outrigger pad" back onto a truck when he turned and "something popped and [he] went down." According to Rieder, he fell backward and hit his head, and he "just la[y] there seeing stars." When Rieder got

---

[1] Western National Mutual Insurance Company issued a worker's compensation policy to Paul V. Farmer, Inc.

up, "it just hurt, like [he] thought [he] pulled something." Rieder attempted to complete his responsibilities for the day, but by the time he arrived back at Farmer's headquarters, he was unable to exit the truck of his own accord or move his left side. The pain was "bad" in his "lower back and … left leg," and he needed the assistance of two coworkers to get out of the truck. Rieder was taken to the emergency room.

¶4      Thereafter, Rieder continued to suffer "jolts" from his low back down into his left leg and pain in his low back, both of which prevented him from returning to his position with Farmer. His injury also prevented him from working other more sedentary jobs, and Rieder's medical provider ultimately recommended that he remain off of work permanently.

¶5      Rieder subsequently filed an application for worker's compensation in September 2020, alleging a traumatic low back injury. An administrative law judge (ALJ) held a hearing on Rieder's claim on September 13, 2021. The ALJ concluded that Rieder had "sustained a temporary lumbar strain or sprain with an end of healing without disability or need for further treatment by February 10, 2020," and denied his claim.

¶6      Rieder sought LIRC review. LIRC reversed the ALJ's decision. In its decision, LIRC credited Rieder's testimony at the ALJ hearing as well as the medical opinion of Dr. Richard G. Yoon, a Mayo Clinic occupational medicine physician and one of Rieder's doctors, in support of its finding that Rieder was "permanently and totally disabled." In particular, LIRC observed that the ALJ did not credit Rieder's testimony "because [the ALJ found that Rieder] engaged in other activities"—such as hunting, fishing, and traveling—"that [the ALJ] thought exceeded his physical restrictions," but LIRC explained that "the evidence did not

demonstrate that [Rieder] exceeded his restrictions" with those activities. LIRC also noted its disagreement with the ALJ's finding that Rieder's conduct at the hearing—i.e., that he put his leg over a chair and was standing with his hands resting on the back of the chair—"was inconsistent with his restrictions."

¶7　Farmer then sought judicial review of LIRC's decision pursuant to WIS. STAT. § 102.23 (2021-22).[2] The circuit court affirmed LIRC's decision in an oral ruling, which was later memorialized in a written order. The court determined that LIRC's decision was supported by substantial evidence in the record, and, given that fact, the court was bound by LIRC's decision. Farmer appeals.

## DISCUSSION

¶8　"On appeal, we review LIRC's decision and not the circuit court's." *Pick 'n Save Roundy's v. LIRC*, 2010 WI App 130, ¶8, 329 Wis. 2d 674, 791 N.W.2d 216. LIRC's decision must be affirmed unless it "acted without or in excess of its powers," its decision "was procured by fraud," or its findings of fact "do not support the order or award." *See* WIS. STAT. § 102.23(1)(e). "The scope of [our] review of an order of LIRC is narrow; [we] may only confirm or set aside an order or award, [we] may not amend it or substitute [our] judgment for the commission's." *See Beecher v. LIRC*, 2004 WI 88, ¶20, 273 Wis. 2d 136, 682 N.W.2d 29.

---

[2] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

*I. De novo review*

¶9 As a preliminary matter, as noted above, Farmer argues that LIRC's determination that Rieder is permanently and totally disabled is a conclusion of law, and, therefore, we should review LIRC's decision de novo. Farmer's assertion is incorrect. It is well settled that LIRC's "findings regarding the determination, cause, extent and duration of a disability are findings of fact, and are conclusive if supported by credible evidence." *See, e.g.*, *Shelby Mut. Ins. Co. v. DILHR*, 109 Wis. 2d 655, 659, 327 N.W.2d 178 (Ct. App. 1982). Thus, in this case, LIRC's disability determination was a finding of fact.

¶10 Farmer also appears to contend, however, that LIRC's determination that Rieder was permanently and totally disabled can only be supported if LIRC applied the "odd-lot" doctrine of permanent and total disability.[3] *See Balczewski v. DILHR*, 76 Wis. 2d 487, 493, 251 N.W.2d 794 (1977). Odd-lot disability determinations are subject to de novo review. *Cargill Feed Div. v. LIRC*, 2010 WI App 115, ¶17, 329 Wis. 2d 206, 789 N.W.2d 326. According to Farmer, given LIRC's finding "that Rieder has the light-duty permanent restrictions assigned by

---

[3] "The odd-lot doctrine is a judge-made adjunct to the law of worker's compensation…. In essence, the odd-lot doctrine provides that some injured workers should be characterized as permanently, totally disabled even though they are still capable of earning occasional income." *Beecher v. LIRC*, 2004 WI 88, ¶2, 273 Wis. 2d 136, 682 N.W.2d 29.

> [W]here a claimant makes a prima facie case that he [or she] has been injured in an industrial accident and, because of his [or her] injury, age, education and capacity, he [or she] is unable to secure any continuing and gainful employment, the burden of showing that the claimant is in fact employable and that jobs do exist for the injured claimant shifts to the employer.

*Cargill Feed Div. v. LIRC*, 2010 WI App 115, ¶1, 329 Wis. 2d 206, 789 N.W.2d 326 (alterations in original; citation omitted).

Dr. Yoon, the only way [LIRC] could conclude that Rieder [is] permanently and totally disabled would be by applying the 'odd-lot' doctrine."

¶11    We disagree that LIRC applied the odd-lot doctrine in this case. First, explicit in Farmer's argument is its belief that LIRC found that Yoon had recommended light-duty permanent work restrictions. In June 2020, Yoon opined that Rieder "had reached maximum medical improvement and assessed a 15% permanent partial disability." As LIRC explained in its decision, Yoon also

> assigned permanent work restrictions, including handling no more than 15 pounds maximum; no dynamic/static balance activities; no prolonged sitting, standing, and walking as tolerated with frequent changes in position as needed. He was to avoid overhead work, operating heavy machines such as cranes, working at unprotected heights, and working where assaultive or physical control situations may be needed. He could participate in twisting, bending, stooping, squatting, kneeling, crawling, climbing, and reaching overhead or forward on an occasional basis.

(hereinafter, light-duty restrictions). Later, in December 2020, after Rieder had attempted, but failed, to return to work in a part-time, sedentary role, Yoon took Rieder off of work permanently.

¶12    In January 2021, Rieder's wife, Sarah, asked Yoon for clarification on Rieder's restrictions *at home*. Yoon responded that Rieder could refer to the aforementioned light-duty restrictions. Based on Yoon's response, Farmer argues that Yoon "clearly rescinded" his instruction that Rieder "remain off work on a permanent basis" in his message to Sarah; thus, according to Farmer, there was no evidence supporting permanent and total disability.

¶13    We disagree with Farmer's characterization of Yoon's message. In her email to Yoon, Sarah said:

[Rieder] was wondering what his weight restriction is for doing things at home. There isn't anything marked on his last sheet. You know, he needs VERY specific instructions for what he is allowed and not allowed to do. He will overdo and hurt himself without clear guidelines. What weight limits and what activities can he do and not do? Can he fish? Use the riding lawn mower or ATV for short times? Can he do light work in the shop like painting or welding if he isn't lifting and can go rest? Can he ice fish if he uses an electric auger or does someone else need to do it? Can he carry wood for the woodstove 3 or 4 pieces at a time? Can he carry groceries in the house or car a couple at a time? Push a shopping cart? His friend that has MS, is he allowed to help him move his foot over the ATV so he can transfer (as long as he does not lift[] or twist[]) can he let his friend put his hand on [Rieder]'s shoulder just for stability? [His l]awyer needs to know that he has the ok for these types of things.

¶14    Yoon responded with the following message:

This is a challenging question since [Rieder] is unable to handle a sedentary job for even a few hours. I recommended that he avoid work at this time, but I do understand that he needs to do things around the house and cannot be expected to remain in bed all day. However, in legal situations I understand the need for specific guidance. I typically don't comment on specific home activities that are safe to perform, but generally advise patients to be cautious with all required activities of daily living. I do feel that many of the activities mentioned in the original question are not required activities for daily living and should be done cautiously as tolerated. He should take care in how frequently or prolonged he is participating in these activities and minimizing the weight handled when possible.

For more specific guidance I would recommend following the last set of restrictions that were formalized before I recommended that he refrain from working entirely. These restrictions were based on my exam and his [Functional Capacity Evaluation]. They include the following: May work 4 hours per day. No handling more than 15 [pounds] maximum, no dynamic/static balance activities, prolonged sitting/standing/walking as tolerated with frequent changes in position as needed. Avoid overhead work, operating heavy equipment such as cranes, working at unprotected heights, and working where assaultive or physical control situations may be needed. May participate in twisting, bending, stooping, squatting, kneeling, crawling, and climbing on an occasional basis. The patient may reach overhead or forward on occasion.

¶15 Importantly, there is nothing in Yoon's message specifically stating that he was rescinding his instruction that Rieder remain off work permanently or that he was reinstating the prior light-duty *work* restrictions. Instead, Yoon confirms that Rieder is "unable to handle a sedentary job for even a few hours," but he acknowledges that Rieder "needs to do things around the house and cannot be expected to remain in bed all day." In recognition of that fact, Yoon provided Rieder's wife with some guidelines for *home* activities, using the example of the light-duty restrictions to aid his explanation. As Rieder observes, "[a]t home, Mr. Rieder is not employed and is able to take frequent breaks, carefully and slowly maneuver, and perform activities as his body tolerates." Therefore, we agree with Rieder that it was appropriate for Yoon to recommend Rieder's previous light-duty work restrictions as guidance for his home activities and that Yoon's email did not suggest that he had changed his medical opinion about Rieder's ability to work.

¶16 Further, we agree with LIRC that Sarah did not provide any new information to Yoon such that he would have been able to make any new or different determinations regarding Rieder's physical capabilities as a result of her email. Sarah's email merely sought guidance regarding Rieder's *home* limitations. Thus, we cannot assume or infer that Yoon meant to rescind his determination that Rieder remain off of *work* when he answered Sarah's email. Additionally, there is no evidence in Rieder's medical records to suggest that his physical situation had changed during this time such that Yoon would have had a reason to amend his previous recommendations regarding Rieder's ability to work. In all, Yoon's message was not a retreat from Yoon's opinion that Rieder remain off of work permanently.

¶17 Moreover, there is no evidence in LIRC's decision that it issued its decision based on the odd-lot doctrine. In fact, LIRC's decision does not mention the odd-lot doctrine, except within its observation that the vocational consultant's report stated that "[Rieder] was very close to becoming odd-lot." LIRC's decision provides no analysis under the odd-lot framework or any indication that LIRC reached the conclusion that Rieder was permanently disabled based on the odd-lot doctrine.

¶18 Farmer argues, however, that LIRC found that Rieder had light-duty permanent work restrictions and that "the 'odd-lot' doctrine need not be specifically referenced in order to be applied." In support of its position, Farmer cites *Balczewski*. There, the Department of Industry, Labor, and Human Relations (DILHR) found Berniece Balczewski fifty-five percent permanently disabled. *Balczewski*, 76 Wis. 2d at 490. Balczewski appealed, arguing for the application of the odd-lot doctrine because "she was permanently precluded from being able to obtain or pursue any income-yielding occupation with reasonable continuity" and was entitled to a finding that she was totally disabled. *Id.* Within its discussion, our supreme court noted the attorney general's statement that he did "not dispute the validity of the 'odd-lot' doctrine as an evidentiary rule and agree[d] with the claimant that such doctrine is implicit in prior decisions of this court" and that DILHR had "made findings of permanent disability on the basis of the doctrine." *Id.* at 496.

¶19 We disagree that *Balczewski* assists Farmer in this case. In *Balczewski*, our supreme court reversed and remanded the case because it concluded "that, although the 'odd-lot' doctrine discussed above is, as acknowledged by the Attorney General, a part of the Wisconsin law, it was not recognized or perceived by the employer or the examiner at the time of hearing,

9

nor was it recognized by [LIRC] on review." *Id.* at 498. *Balczewski* does not stand for the proposition that LIRC's determination of permanent disability becomes subject to de novo review based on LIRC's allegedly implicit, unrecognized, and undiscussed application of the odd-lot doctrine. Thus, we conclude that LIRC issued a traditional disability determination, not a determination based on the common-law odd-lot doctrine, and, therefore, de novo review of LIRC's decision is inappropriate under these circumstances.

## II. Sufficiency of the evidence

¶20 Given our conclusion that LIRC's disability determination was not based on the odd-lot doctrine and that it was a factual finding, the final question in this appeal is whether LIRC's finding was supported by credible and substantial evidence. LIRC's findings of fact are conclusive if supported by "credible and substantial evidence." *See* WIS. STAT. § 102.23(1)(a), (6); *Bosco v. LIRC*, 2003 WI App 219, ¶24, 267 Wis. 2d 293, 671 N.W.2d 331. "Credible evidence is that evidence which excludes speculation or conjecture," while "[e]vidence is substantial if a reasonable person relying on the evidence might make the same decision." *Milwaukee Bd. of Sch. Dirs. v. Wisconsin Emp. Rels. Comm'n*, 2008 WI App 125, ¶7, 313 Wis. 2d 525, 758 N.W.2d 814.

¶21 "[A]s long as there is credible evidence to support [LIRC's] findings, we will uphold them even if they are against the great weight and clear preponderance of the evidence." *General Cas. Co. v. LIRC*, 165 Wis. 2d 174, 178, 477 N.W.2d 322 (Ct. App. 1991). As relevant here, in the case of medical witnesses, LIRC is the sole judge of the weight and credibility of the witnesses. *See Bumpas v. DILHR*, 85 Wis. 2d 805, 817, 271 N.W.2d 142 (Ct. App. 1978); *see also* WIS. STAT. § 102.23(6). "If there are contradictory medical reports,

10

[LIRC's] findings are conclusive," and "[i]t is for [LIRC] to decide if one expert's testimony is more persuasive than another's." *Bumpas*, 85 Wis. 2d at 817. LIRC's "decision may be set aside by a reviewing court only when, upon an examination of the entire record, the evidence, including the inferences therefrom, is found to be such that a reasonable person, acting reasonably, could not have reached the decision from the evidence and its inferences." *See Hamilton v. DILHR*, 94 Wis. 2d 611, 618, 288 N.W.2d 857 (1980). "The burden of showing that LIRC's decision was not supported by credible and substantial evidence is on the party seeking to set aside LIRC's findings and order," here, Farmer. *See Xcel Energy Servs., Inc., v. LIRC*, 2013 WI 64, ¶48, 349 Wis. 2d 234, 833 N.W.2d 665.

¶22     Based on our review of the record, we conclude that LIRC's finding that Rieder is permanently and totally disabled was supported by substantial and credible evidence. At the hearing with the ALJ, Rieder testified regarding the circumstances of his work injury, his subsequent treatment, and his efforts at rehabilitation. Rieder explained that he continues to suffer fifteen to twenty-five "jolts" "from [his] lower back all the way down to [his] left toe" every day, even when sleeping. He also explained that his baseline level of pain was a three on a ten-point scale. According to Rieder, he participated in "work hardening" to "increase[e] [his] ability to lift and [his] stamina" in order to return to his position as a crane operator, but the therapy was unsuccessful. Yoon put him on "permanent restrictions." Farmer did not have a position for Rieder with "those restrictions," and so Rieder found a position as a COVID screener at Chippewa Valley Technical College (CVTC). Rieder testified that although the job allowed him to "just sit[] for a long amount of time," it was too much for him because his "back was killing" him. According to Rieder, after a period of working eight-hour

11

shifts three days a week at CVTC, he ended up in the emergency department with increased back pain. Yoon then recommended that Rieder work only four-hour shifts, but Rieder testified that the same increased back pain occurred. Based on these experiences, Rieder testified that he would be unable to work a full-time or part-time job.

¶23 Sarah's testimony at the hearing was consistent with Rieder's testimony. She explained that Rieder "wanted to get better," and "he did everything everybody asked him to." According to Sarah, when Rieder attempted to return to work at CVTC, "the shocks in his leg were … 40 a day; and that pain in [his] back was just stabbing." Even when Rieder worked four-hour shifts, Sarah explained that "we didn't see any decrease in the symptoms. He was still having the same amount of shocks, and he just continued to stay miserable like that and couldn't even tolerate the four hours."

¶24 Rieder's medical records also demonstrate the extent of his injury. Over the course of more than two years, Rieder's medical records demonstrate that he saw numerous medical providers regarding his back pain, including trips to the emergency department, where he consistently reported pain between three and eight on a ten-point scale. The records demonstrate that Rieder's reports of pain were supported both by diagnostic imaging and physical exams. Rieder also received lumbar injections, underwent a spinal stimulator implantation procedure, and participated in physical therapy and a work hardening program several times per week to help reduce his pain and resolve his injury. Of note, Yoon stated in a supplementary letter on October 11, 2021, that Rieder had "always been compliant with the recommendations by his treating providers" and that "he made every attempt to get back to his previous level of functioning and back to his regular job." Yoon further opined in that letter that "Rieder is not a malingerer" and that

Yoon never thought that Rieder "could be exaggerating or feigning a component of his exam."

¶25 LIRC specifically credited Yoon's medical opinions in its decision. Yoon began treating Rieder shortly after his work injury. According to the record, in October 2020, after Rieder attempted to return to work for eight-hour shifts at CVTC, Yoon recommended that Rieder "reduce [his] hours to 4 hours per day while his symptoms are flared up" and follow light-duty restrictions. Thereafter, at a November 9, 2020 office visit, after Rieder had switched to four-hour shifts, Yoon noted that the CVTC work was "barely tolerable and it is very difficult for him." As a result, Yoon recommended "remaining off of work to see whether [Rieder's] symptoms improve while he is off of work." Finally, at a December 15, 2020 office visit, after noting minor improvement of Rieder's symptoms as a result of remaining off work, Yoon stated, "At this time the patient should remain off of work on a permanent basis." Yoon reiterated this information in the WKC-16-B worker's compensation form on December 24, 2020.

¶26 Finally, vocational consultant John J. Woest conducted a vocational evaluation of Rieder, which was included in the record. Woest stated the following in his evaluation:

> As he is today, due to a combination of age, very specific skill base, no computer skills, and significant work restrictions, he falls very close to becoming odd-lot (assuming full-time work within his restrictions). However, after an unsuccessful attempt at working part-time in a sedentary capacity, Dr. Yoon has taken Mr. Rieder off work completely, now rendering him 100% permanently and totally vocationally disabled (as a consequence of his work injury).

¶27 Overall, we conclude that the testimony presented at the hearing before the ALJ, Rieder's medical records, Yoon's medical opinions, and Woest's

vocational report all provide substantial and credible evidence to support LIRC's finding that Rieder is totally and permanently disabled. LIRC specifically credited Rieder's testimony "that he has ongoing lumbar pain and lumbar radiculopathy, with pain and jolts that travel down his left leg … and that this condition severely limits his activities." It also stated that it credited Yoon's opinion that Rieder suffered a work injury to his low back "in the nature of an annular tear and herniated nucleus pulposus at L3-4 and a complete full-thickness defect of the right-sided annulus at L4-5" and that Rieder "has the permanent restrictions as determined by Dr. Yoon." Given Yoon's involvement in Rieder's medical care since close to the time of the original injury, it was reasonable for LIRC to rely heavily on Yoon's medical opinions.

¶28 For several reasons, we are not persuaded by Farmer's arguments in support of its position that the evidence did not support LIRC's finding. First, as we addressed above, *see supra* ¶¶11-15, Yoon's email message to Sarah did not rescind his recommendation, from December 2020, that Rieder "remain off work on a permanent basis." Thus, Farmer's assertion that Yoon's recommendation was for light-duty work restrictions, not abstention from work, is incorrect.

¶29 Next, Farmer contends that LIRC "specifically found that Mr. Rieder had light-duty permanent restrictions and relied on evidence that his actions were within said restrictions to support its conclusion that Mr. Rieder [is] permanently and totally disabled." We do not read LIRC's decision as adopting the light-duty restrictions previously recommended by Yoon as the basis for its finding that Rieder [is] permanently and totally disabled. Farmer attempts to create inconsistency in LIRC's decision by twisting the use of individual words and further argues that its differing views of the evidence in this case support a different conclusion. However, these efforts do not change the fact that Yoon's

recommendation, along with other evidence in the record, provided substantial and credible evidence in support of LIRC's finding of Rieder's permanent and total disability.

¶30    Further, according to Farmer, "Yoon did not permanently restrict Rieder from working.  Rather, he recommended that Rieder remain off work temporarily, noting that it was in Rieder's best interest to not return to work at that time."    Given Farmer's contention above that Yoon later rescinded this recommendation, Farmer argues that "it is very clear that Dr. Yoon [did] not believe that Rieder is physically incapable of working."

¶31    The evidence, however, clearly shows that Yoon believed that Rieder was incapable of working.  What Yoon actually stated was as follows:

> At this time the patient should remain off work on a permanent basis.  Despite his attempt to return back to work with significant restrictions, he was unsuccessful in this attempt despite only working a few hours as a door screener which is a sedentary job.  Without any other significant treatment options available, I do not feel it is in the patient's best interest to return to work at this time.

Thus, while Yoon used the phrase "at this time," it was in the context of explaining Rieder's inability to work even a part-time, sedentary job and recognizing that Rieder had no more treatment options available, such that there was no possibility that further treatment could alter his situation.  Given those circumstances, it was reasonable for LIRC to infer that Yoon's recommendation that Rieder "remain off work on a permanent basis" supported its conclusion that Rieder is permanently and totally disabled.  *See Hamilton*, 94 Wis. 2d at 618. Accordingly, Farmer has not met its burden to demonstrate why LIRC's decision should be overturned.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.